

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Lee Brady, Commissioner,
Department of Banking
Austin, Texas

Dear Mr. Brady:

Opinion No. O-2206
Re: Title 9, Chapter 16, Re-
vised Civil Statutes --
Morris Plan Bank -- Pro-
posed plan of operation
-- Usury -- Certificate
of Indebtedness -- Cer-
tificate of Investment.

This will acknowledge receipt of your letter of
date April 8, 1940, submitting for an opinion from this
department the following case and questions:

"A number of persons have proposed to file ap-
plication for a Morris Plan Bank charter under Chapter 9
of the Banking Act.

"In connection with this application they have
voluntarily disclosed the proposed plan of operation un-
der the charter, if it is obtained. This plan, briefly
stated, is as follows:

"The bank proposes to issue investment certifi-
cates payable in twelve monthly installments, or less,
the total of the installments being equal to the face value
of the investment certificates, said certificates maturing
and being payable thirty-six months from date. The cer-
tificate is to bear interest from the date of full payment
(twelve months unless accelerated) at the rate of 3% per
annum. To evidence the purchase price of the certificate
the investor executes a note of a face value equal to the
face value of the investment certificate, and payable in
ten or twelve equal monthly installments, bearing inter-
est from maturity, and containing the usual acceleration
and attorney's fees clauses. It is to be noted that under

Honorable Lee Brady - Page 2

the provisions of the certificate it is to bear interest from the date when fully paid, rather than twelve months from date, and hence if the note is accelerated and collected the bank is obligated to pay interest from the date of full payment.

"The certificate, however, contains a provision that in event the investor elects to withdraw his investment prior to the maturity of the certificate that his investment will be subject to discount according to a table of withdrawal values which is incorporated in the face of the certificate. While the exact amount of the discount has not yet been fixed it may be illustrated by the following:

"If the certificate is for $120.00 and is withdrawn at the end of the first year it will be subject to a discount of $20.00, and if withdrawn at the end of the second year the discount will be $12.00.

"The bank also contemplates making loans and proposes to charge interest at the rate of 6% per annum to be deducted in advance from the face of the note, together with $1.00 per $50.00 for investigation fee. In connection with the loan, and, at least, as a usual requirement, the bank expects to require the borrower to purchase an investment certificate such as above described for an amount equal to 120% of the amount of his loan note, the certificate to be pledged to secure the payment of the loan.

"Roughly, the plan, when put into operation, will operate as follows: The borrower decides to obtain a loan for approximately $100.00. He executes a note for $100.00 payable one year after date, bearing interest from maturity at a legal rate. From the proceeds of the loan $6.00 is deducted as interest and $2.00 as investigation fee, the borrower receiving $92.00 cash. Simultaneously with the execution of the loan note, as above described, the borrower purchases an investment certificate for $120.00 on the plan above outlined executing a note for the purchase price of the certificate in the sum of $120.00, and payable in twelve monthly installments of $10.00 each. This note contains an acceleration clause and attorney's fees clause. The certificate, as thus purchased, is pledged with the bank as security for its loan.

"If the borrower pays each installment on the certificate as provided, he will, at the end of the year, have paid in $120.00. This, however, does not constitute payment of the debt arising out of the loan. The borrower is not required to cancel the certificate at the withdrawal value, namely, $100.00. Instead he may raise $100.00 from some other source and pay his indebtedness, retaining the certificate as an investment, and the investment will start to bear interest at the rate of 3% per annum. If, on the other hand, the borrower is unable to pay his debt from other sources and defaults, the bank has the right, under the contract, to surrender the certificate at its withdrawal value, namely, $100.00. If, this occurs, the bank will have received, in excess of the money loaned, the sum of $28.00, being $8.00 deducted from the loan and $20.00 discount on the certificate of investment.

"In considering these instruments and the plan of operation the proponents of the bank insist that the loan as evidenced by the note, on one hand, and the purchase of the certificate and the certificate itself on the other hand, are entirely separate and distinct transactions, not to be construed as one contract. They point out with considerable force that there is no legal obligation on the part of the borrower to cancel out his certificate at the maturity of the note, that the borrower, if he can raise the amount of his debt from other sources, has the legal right to pay off the debt at maturity of the note, and that he will pay exactly the interest which is contemplated under the provisions of Section 1, Article 545 of the Revised Statutes. They insist, that such being the case, the interest charged is legal. They further take the position that if the borrower, at his own election, should decide that it is to his best interest to withdraw the investment at the withdrawal value and pay his debt, that such is not a matter of interest to this Department or a violation of any law; further, that if the borrower fails to pay the debt, that the corporation is within its legal rights in applying the certificate at the withdrawal value to the debt.

"On the other hand, these instruments may possibly be construed as one instrument. The courts might take the position that all constitute a single contract under which the borrower obtains $92.00 cash and pays back $28.00 for the use of the money, for an effective period of six months. Under such a construction it is possible that the courts will hold that this

contract provides for interest at the rate of from sixty to eighty per cent per annum.

"We respectfully submit to you for decision the following questions:

"1. Does the plan of operation, as outlined above, violate the law of this state relative to usury?

"2. Does the plan, as outlined above, come within the corporate power of a Morris Plan Bank, organized under Title 9 of the Banking Act of this State?

"3. Is a Morris Plan Bank authorized to insert in its certificate of investment a provision to the effect that the certificate will be discounted below the amount paid in, if withdrawn prior to maturity?

"4. Is a Morris Plan Bank authorized to insert in its certificate of indebtedness a provision that in event of application of the certificate to the indebtedness due the bank, prior to the maturity of the certificate of indebtedness, the bank may discount the certificate of indebtedness and credit to its debt an amount less than the full amount paid in on the certificate of indebtedness by the borrower?

"5. Is the certificate as described above a certificate of indebtedness or a certificate of investment?"

1. The plan of operation, as outlined in your letter, does constitute a violation of the usury laws of this State.

Section 1 of Article 545 of the Revised Civil Statutes, regulating Morris Plan banks, provides:

"To lend money and to deduct interest therefor in advance at a rate not to exceed six per cent per annum, and in addition to require and receive uniform weekly or monthly installments on its certificates of indebtedness purchased by the borrower simultaneously with the said loan transaction, or otherwise, and pledged with the corporation as security for the said loan, with or without an allowance of interest on such installments."

This statute contemplates, and your statement of the proposed plan contemplates, a dual transaction in the matter of making a loan by the bank to a customer. That is, the customer will execute to the bank his promissory note, bearing interest not to exceed 6% per annum for the amount of the loan. It likewise is contemplated that the bank will issue, or has issued, to the customer its certificate of indebtedness in an amount at least equal to the amount of the loan, for which the customer agrees to pay in uniform weekly or monthly installments, with or without an allowance of interest, the certificate to be pledged for the security of the customer's loan indebtedness. The statute and the plan likewise further necessarily contemplate that unless the customer voluntarily assents to the application of his certificate of indebtedness to his loan indebtedness, upon its maturity, the bank will have, and may exercise its right of offsets. This is the legal effect of the contract of the parties in the two transactions, even though they be treated as separate transactions. What the law implies from the terms of the contract is as much a part of the contract as though it had been expressly written therein. The application, therefore, of the customer's certificate of indebtedness credit is an agreed method of payment of his loan indebtedness in case of default.

Now, the vice of usury in a transaction does not depend upon express unconditional agreement of the borrower to pay interest in excess of the lawful rate, it may be shown by a collateral agreement, such as one for acceleration of the principal. It is well settled that where, by reason of an agreed acceleration for default, an unlawful interest upon the sum loaned will be required, the transaction is usurious, notwithstanding the fact if the borrower had in all respects performed he would not have paid usury. See Temple Trust Co. et al vs. Haney et ux, 103 S. W. (2) 1035, 107 S. W. (2) 368.

The plan we are considering does not involve any question of acceleration, but the principle involved in the acceleration cases applies here with full force, because for the customer's default in the payment of his loan indebtedness he is penalized in the amount of the discount of his certificate of indebtedness credit, which, together with the interest as such charged upon the loan, far exceeds the permitted rate, for which reason the transaction proposed by your inquirers is usurious.

2. What we have said in answer to your question No. 1, in effect, answers your question No. 2. Obviously, the Legislature never intended to confer upon such corporations the power to violate the Constitution with respect to usury, as would be the result if the corporate power embraced the right to discount its certificates of indebtedness for money actually received. What we have here said also answers your fourth question.

3. We are inclined to the view that the terms "certificates of indebtedness", found in Section 1 of Article 545, and "certificates of investment", found in Section 2 of the Article, mean one and the same thing. It will be observed that Section 1, in authorizing the purchase of a certificate of indebtedness, in connection with a loan, does not require that the same be purchased simultaneously with the loan transaction. The Legislature, in order to make clear this point, probably included the general power to sell (and to issue) its certificates of investment, without respect to a loan.

Again, "certificates of investment", as a class of securities, is mentioned only in subdivision 2 of Article 545 in connection with authority to sell or negotiate bonds, notes and choses in action for the payment of money, thus indicating possibly a broader intention than to confer the mere power to issue certificates of investment, but the more general power to deal in such certificates as the bank may deal in bonds, notes and choses in action.

At all events, any attempt to differentiate between "certificates of indebtedness" and "certificates of investment" is purely academic in the light of what we have already said in answer to questions 1 and 2, so that, we need not to answer questions 3, 4 and 5.

It will be borne in mind that the amendment to Article 545 by the 46th Legislature did not change subdivision 1 of the Article, but did add to subdivision 2 as the beginning thereof the new power "to receive money on time deposits." Certainly, the Legislature did not contemplate that a certificate of time deposit could be discounted as a corporate function, and with equal certainty, we think, the Legislature did not contemplate

that the bank's certificate of indebtedness, which in its nature is very much akin to a certificate of deposit, could be discounted in the manner contemplated by the proposed incorporators.

In the view we have taken of this situation it is immaterial whether the loan proper and the issuance and sale of the certificate of indebtedness be considered as separate transactions, as they may be under the authorities, or as one, the result is the same.

Trusting this will have answered your questions satisfactorily, we are

Very truly yours

ATTORNEY GENERAL OF TEXAS

By

Ocie Speer
Assistant

OS-MR

APPROVED MAY 3, 1940

ATTORNEY GENERAL OF TEXAS



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN